**Mary COGGON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. CIV.A.03–12421–WGY.**

United States District Court,
D. Massachusetts.

Feb. 3, 2005.

Sarah F. Anderson, Greater Boston Legal Services, Health & Disability Unit, Boston, MA, for Mary Coggon, Plaintiff.

Gina Y. Walcott–Torres, United States Attorney's Office, Boston, MA, for Jo Anne B. Barnhart, Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

This action is brought under sections 205(g) and 1631(c)(3) of the Social Security Act, codified at 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner"). The plaintiff Mary Coggon ("Coggon") challenges the decision of the Administrative Law Judge ("hearing officer") denying her Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Coggon argues that the decision of the hearing officer was not supported by substantial evidence and contained errors of law and that he "misapplies the disability standard, and fails to adequately consider the opinion of [Coggon's] treating physician." Pl.'s Motion to Reverse or Remand Decision [Doc. No. 5] at 1; Pl.'s Memorandum in Support of Motion to Reverse or Remand [Doc. No. 9] at 1 ("Pl.'s Mem."). Coggon requests that this Court reverse the decision, or in the alternative, remand the case for reconsideration. The Commissioner filed a cross motion to affirm the decision of the Commissioner. Def.'s Motion for Order Affirming the Decision of the Commissioner [Doc. No. 11] at 1; Def.'s Memorandum in Support of the Decision of the Commissioner [Doc. No. 12] at 21 ("Def.'s Mem.").

## II. BACKGROUND

### A. Procedural History

Coggon filed for SSI and DIB on June 14, 2000, alleging she became disabled on June 9, 2000. R. at 93–95, 242–245. The Commissioner denied Coggon's claim on November 6, 2000. Id. at 63–68. Upon a request for reconsideration, Coggon's application was reevaluated and her claim was again denied on January 12, 2001. Id. at 70–73, 248–251. Coggon requested and was granted a hearing before a hearing officer which was held on November 30, 2001. Id. at 27, 76. After the hearing and a review of the evidence, the hearing officer denied Coggon's claim on September 21, 2002, because: (1) she had not established that she was disabled under the Social Security guidelines, (2) she was capable of doing other work, and (3) her testimony was not entirely credible. Id. at 15–25; Pl.'s Mem. at 4; Def.'s Mem. at 2. Coggon petitioned the Social Security Appeals Council for a review of the decision of the hearing officer, but her request was denied on September 15, 2003. R. at 8. The decision of the hearing officer thus

constituted the final decision of the Commissioner. *Id.* On December 31, 2003, Coggon filed the instant action in this Court to review the decision of the Commissioner pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Pl.'s Complaint [Doc. No. 3] (filed Dec. 31, 2003) ("Pl.'s Compl.").

Coggon argues that the Commissioner's decision was incorrect as matter of law because the "substantial evidence of record ... does not support the conclusion that the plaintiff is not disabled" and because the "Commissioner's decision is based on errors of law, as it violates the Social Security Act, 42 U.S.C. § 401 *et. seq.* and controlling regulations, fails to properly apply the regulations concerning treating source opinions, and mischaracterizes the evidence." Pl.'s Compl. at 4. Coggon requests this Court: (1) reverse and award her benefits or remand the matter to the Commissioner, (2) grant her attorney's fees and costs, and (3) grant her "additional and alternative relief as equity and justice may require." *Id.*

## B. Factual Background

Coggon was born on February 28, 1954, in Brockton, Massachusetts. R. at 30. She has a high school diploma and an Associate Degree from Quincy Junior College in Science/pre-nursing. *See id.* at 30–31. She also attended Massasoit Community College but dropped out after one year, *id.* at 31, she claims due to anxiety. *See id.* at 143. She was married, had a child in 1972, and later divorced in 1975. Pl.'s Compl. at 2. There are claims that Coggon was the victim of domestic abuse. R. at 143. Coggon has a son who was 29 years old at the time of the hearing. *Id.* at 31–32. Coggon lived alone in a first-floor apartment in Somerset. *Id.* at 32. Coggon had a driver's license and drove "to stores and doctors' appointments" us-

ing approximately a tank of gas per week. *Id.* at 32–33, 40–41. Coggon "is capable of dressing and bathing, using the stove, putting dishes in the sink, laundry in the washer, if it is not heavy.... She is capable of interacting, going to the store to get items, and capable of cashing a check or using an ATM." *Id.* at 144 (Dr. Slayton's Consultative Examination Report).

In 1991, Coggon ended her Aid to Families with Dependent Children ("AFDC") support and worked as a self-employed house cleaner from 1991 to June of 2000, for which income she filed and paid taxes, and during which time she also raised her son. *Id.* at 34–35; Pl.'s Compl. at 2; Pl.'s Mem. at 2. Upon terminating her work, she pursued and received Massachusetts Emergency Aid to Elderly, Disabled and Children benefits ("EAEDC") rather than unemployment benefits. R. at 35. Coggon's present monthly income is $303.80 from EAEDC and food stamps. *Id.* at 32.

### 1. Medical Evidence

#### a. Rheumatoid Arthritis

Coggon had an oophorectomy[1] in 1995 at New England Medical Center. *Id.* at 39; Pl.'s Mem. at 2. Coggon asserts she did not "recover from that surgery quite as great as [she] thought [she] would" and claims the problems with her feet arose after the surgery. R. at 39; Pl.'s Mem. at 2–3. Coggon complained of "sharp pains under the balls of her feet" and "toes [that] were sore and inflamed" and "painful to the touch." Pl.'s Mem. at 3. Coggon testified that her "feet hurt" with a "sharp pain" when she walked and that her "toes were sore and inflamed" and her "feet hurt all the time." R. at 39–40.

---

1. An "oophorectomy," or "ovariectomy," is the "surgical removal of an ovary." Mer-
riam–Webster's Medical Desk Dictionary 561, 573 (1996).

**(1) Dr. Massarotti's Diagnosis and Notes**

Coggon reports having a history of rheumatoid arthritis since 1996. *Id.* at 19, 142. In March of 1997, Coggon was diagnosed with rheumatoid arthritis by Dr. Elaine Massarotti ("Massarotti"), a specialist with the Itzhak Pearlman Family Arthritis Treatment Center at New England Medical Center. Pl.'s Mem. at 3. Pertinent portions of Massarotti's notes of Coggon's visits and tests follow:

*June 11, 1999:* "[Coggon] has had stable forefoot pain for the last two years with questionable erosive change on x-rays and the rheumatoid factor has been positive, but is now negative. She occasionally notices pain in the joints of the upper extremities." R. at 186.

*November 19, 1999:* "Coggon had a ligament injury to her left ankle recently.... Since then, she has placed more pressure on her right foot and may be having more joint pain. She had tapered off her medications inadvertently and found that she had more joint pain with it. She has little pain in the joints of the upper extremities and morning stiffness.... This rheumatoid variant has been moderately well-treated with sulfasalazine and Voltaren, which I suggested she continue for now.... I suggested a trial of methotrexate which she was not inclined to do at this point." *Id.* at 184 (letter to Dineli Gunawardene, M.D.).

*December 8, 1999:* X-ray reports showed "[f]indings which may be consistent with rheumatoid arthritis." *Id.* at 193, 194

*April 26, 2000:* "Unfortunately, since her last visit, she has developed increasing hand pain, finger pain, and morning stiffness. She has been unable to open jars, and continue with her activities of daily living. She is quite tearful and depressed today. In February, her knees also began to hurt and her feet have become more and more painful.... Her rheumatoid arthritis has become much more active now. She has agreed to begin methotrexate." *Id.* at 185.

*June 9, 2000:* "She continues to be very stiff and uncomfortable. Her hands and feet are very painful. She is having some difficulty with activities of daily living. For a period of a few days she had difficulty getting out of bed because of the pain and swelling which also seemed to affect her knees at that time. [Coggon] has seropositive/seronegative inflammatory rheumatoid arthritis. [S]he will continue with the methotrexate for now but I have asked her to begin prednisone." *Id.* at 182.

*July 7, 2000:* "Coggon ... was treated with prednisone beginning a month ago. Five days after beginning [it], she noticed a decrease in morning stiffness and joint pain, and her spirits have also improved.... She had good range of motion in the neck, shoulders, and elbows.... The hips and knees moved well and the MTP squeeze was positive, but better than on June 9th. She has begun to respond to treatment. She will decrease the prednisone ... provided she is asymptomatic." *Id.* at 181.

*September 13, 2000:* "Coggon perhaps feels a little bit better. She was able to taper the prednisone ... with some residual stiffness in the morning but it is unclear to determine how much pain she is having the rest of the day. She is finding activities of daily living difficult.... I think she is responding to methotrexate but I am not happy with her continued requirement of prednisone and continued synovitis." *Id.* at 180.

*November 17, 2000:* "Coggon...returns...for evaluation and treatment of seropositive erosive rheumatoid arthritis. Though she is taking prednisone

every other day she continues to be stiff and has pain in her feet and hands.... She continues to take Voltaren[2].... Unfortunately, her disability was denied....I encouraged her to continue with prednisone ... but she may want to discontinue it." *Id.* at 179

Massarotti wrote a "To Whom It May Concern" letter on Coggon's behalf in this matter dated May 12, 2001, nine months after Coggon's last visit, indicating that Coggon had been under Massarotti's care for the treatment of arthritis for several years. *See id.* at 233; Pl.'s Mem. at 8. Massarotti noted the progression of symptoms from her feet to her hands and wrists and concluded that she believed Coggon was "unable to work and medically disabled as a result of this illness." R. at 233.

Conversely, Dr. Jonas in his consultative examination indicated that:

There did seem to be some inconsistencies ... For example, the complaint of foot pain is substantial, but the physical findings are frankly modest considering the record ... not only that she is able to walk [with] apparently relatively normal shoes and without cane or crutch or anything, but also without a limp. Furthermore, ... when she was frustrated in the hearing from time to time she had ... a personal tendency to stamp [sic] her feet on the ground. I was surprised that she would do that, but she also didn't seem to react to that by feeling an increase of pain. At least she didn't give an outward expression of that. So I'm not sure that the complaint of pain is not substantially amplified in contrast with the actual objective condition.

*Id.* at 47–48.

After the hearing, Massarotti completed an Arthritis Residual Functional Capacity Questionnaire and opined that Coggon "would often have symptoms that would interfere with attention and concentration and that she was moderately limited in her ability to deal with work stress, though she felt it was 'hard to say.'" Def.'s Mem. at 7; R. at 237–238. She also opined that Coggon could sit and stand continuously for ten minutes at one time, could sit for a total of two hours and stand/walk for a total of two hours in an eight hour period, and would have to walk for five minutes for every twenty minutes she spent working. R. at 239. She indicated that Coggon "need[s] a job which permits shifting positions *at will* from sitting, standing or walking" and that Coggon would have to take unscheduled breaks during an eight hour period. *Id.* at 239–240 (emphasis within original). Massarotti opined that Coggon could "frequently" carry less than ten pounds, "occasionally" lift ten to twenty pounds, and "never" carry fifty pounds. *Id.* at 240. She also opined that Coggon "could use her hands, fingers and arms each for twenty-five percent of the time during an eight hour day and that she could bend/twist ten percent of the time." Def.'s Mem. at 7; R. at 241. This questionnaire was completed on January 7, 2002, more than one year after Coggon's last visit to Massarotti on November 17, 2000. *See* R. at 179, 241.

(2) **Dr. Stammen's Consultative Examination**

A Consultative Examination Report was prepared by Karl F. Stammen, M.D. ("Stammen") upon the request of the Massachusetts Rehabilitation Commission Disability Determination Services, on September 19, 2000. *Id.* at 19, 146–148. Stammen noted in his report that Coggon's gait was "essentially normal in spite of the history that she had painful feet and painful joints in the area of the feet." *Id.* at 147. Stammen deemed Coggon's neurological examination and muscle

---

**2.** ·Voltaren is a drug used for the treatment of mild to moderate rheumatoid arthritis.

strength normal. *See id.* The musculo-skeletal exam found "full range of motion without tenderness of ankles, knees and hips. [The] lumbosacral spine show[ed] no pain on motion." *Id.* Stammen also found Coggon could "bend forward without limitation" and that she had "full range of motion of the cervical spine, shoulders and elbows, [and] full range of motion of the hands and wrists." *Id.* at 147–148. Stammen concluded that there were no inflammatory signs other than the "mild atrophy of the toes." *Id.* at 148.

(3) **Dr. Slayton's Consultative Examination Report**

Dr. James M. Slayton, M.D. ("Slayton"), conducted an examination of Coggon on September 16, 2000. *Id.* at 141–145. Slayton noted his impression that Coggon has "mood symptoms and clear anxiety symptoms" and "complicated personality traits." *Id.* at 145. Slayton notes that though she would have "a difficult time" interacting with coworkers in a typical work environment, "[i]t is conceivable that she would do well in a structured vocational rehabilitation program that takes into account her arthritis and her clearly complicated personality traits." *Id.*

(4) **Other assessments**

Two Physical Residual Functional Capacity Assessments, conducted in October and December of 2000, found Coggon "had functional capacities consistent with a limited range of light work with additional postural and environmental restrictions." Def.'s Mem. at 5; *see* R. at 168–172, 197–204.

(5) **Testimony of Dr. Jonas at the Hearing Before the Hearing Officer**

Dr. Jonas, the medical expert at the hearing, testified that Coggon's complaints of foot pain were not consistent with the modest physical findings on the record. R. at 47. "[Jonas] observed that when [Coggon] was frustrated during the hearing from time to time, she stamped [sic] her feet but did not react to that action with any observed increase in pain." Def.'s Mem. at 5; R. at 47–48. Jonas also observed that Coggon could walk, wore normal shoes, and was not aided by a crane or crutch as one might expect given her complaints. *See* R. at 47. Jonas further indicated, when discussing Coggon's stomping her feet on the floor during the hearing, that he was not "sure that the complaint of pain is not substantially amplified in contrast with the actual objective condition. And this might also reference the personality issue, particularly with the dependency related features." *Id.* at 48. Jonas testified that there is nothing in the record or in Coggon's testimony to "suggest any impairment of ability to perform activities of daily living." *Id.* at 48 (testimony of Alfred G. Jonas, M.D.).

2. **Depression and Anxiety Disorders**

At the time of the November 2001 hearing, Coggon testified that she had been seeing a therapist. *Id.* at 44–45. She indicated that she had seen the same therapist years ago but stopped seeing her, and that when she "got this disease, [she] realized it was much harder dealing with [her] depression." *Id.* at 44. Coggon stated that she "had insurance so [she] got to go and see her again." *Id.* When the hearing officer asked if her therapist discussed work with her, Coggon replied "[w]ell, she said don't feel guilty because you can't work." *Id.* at 45. There is a reference in Massarotti's notes indicating "[a] new sleeping medication has been prescribed by her psychiatrist, Dr. Cahill." *Id.* at 180. The hearing officer indicated that "it's fair to say that the emotional issues here, her ability to cope with the physical condition and emotional reaction to what she perceives is the physical condition is the crucial element." *Id.* at 58.

Coggon saw James M. Slayton, M.D. ("Slayton"), a consultative examiner, and asserts his primary diagnosis was that she had "mixed personality disorder, including prominent borderline and dependent features." Pl.'s Mem. at 3. This is a correct restatement of Slayton's primary Axis II diagnosis. R. at 144–145. Slayton also states that Coggon "note[d] urges to leave" those situations in which she is anxious or confused "and typically, if she is able to do that, she gets relief within 20 minutes." Id. at 141. Jonas stated that Slayton "clearly ... states that he feels that the personality is the central issue." Id. at 47. Jonas further testified that Coggon only had "moderate limitations in one category, her social functioning." Id. at 22.

### a. Testimony of Vocational Expert

At Coggon's hearing, the vocational expert, Carl E. Barchi ("Barchi"), was asked by the hearing officer to consider a hypothetical claimant of Coggon's age, education, and work experience, who could perform "at least sedentary work, some light work," who "could lift ten pounds frequently, 20 pounds occasionally" and who would need a job "where she's off her feet let's say four or five hours and on her feet from time to time two to three hours" or "jobs that would allow her to sit down whenever she feels the need." Id. at 55–56. Barchi indicated that "[a]s far as unskilled sedentary jobs that she could do given the residual functional capacity would be a record clerk, cashier or assembler" or "receptionist." Id. at 56.

The hearing officer inquired as to Barchi's information that there would be 2,548 sedentary receptionist positions. Id. The hearing officer indicated that "if she's going to have difficulty with the supervisor because she wants to sit down and the supervisor doesn't think she can or she's going to have difficulty in staying on the job ... [i]t can present difficulties." Id. at 57. Barchi agreed that there is "no reasonable accommodation allowing a person to sit down briefly." Id. Barchi also agreed with Coggon that "[i]f somebody has limitations using both hands on a regular basis, has difficulty gripping things, has difficulty closing jars and has limitations on picking things up using both hands" that it would "limit the number of jobs" he suggested. Id. at 59.

### 3. Irritable Bowel Syndrome

Coggon claims irritable bowel syndrome as part of her disability. Id. at 46. Slayton's notes in his Consultative Examination Report that Coggon indicates having "a history of irritable bowel syndrome, which she states is diet-controlled." Id. at 14. In November of 1999, Massarotti pointed out that the claimant denied having diarrhea or abdominal pain. Id. at 184. The hearing officer stated that the "record does not contain any formal treatment notes for the claimant's alleged irritable bowel syndrome." Id. at 20. This Court agrees with the hearing officer that there is insufficient support in the record to reflect such a medical diagnosis or to disturb his findings on this particular matter.

## II. DISCUSSION

### A. Standard of Review

■■■ Review of a Social Security disability benefit determination by this Court is limited by section 405(g) of the Social Security Act, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Manso–Pizarro v. Sec'y of Health and Human Servs.,* 76 F.3d 15, 16 (1st Cir.1996). "Substantial

evidence exists when a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support the Commissioner's conclusion." *Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass.2001) (quoting *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.1991)) (internal quotation marks omitted). The Commissioner must make credibility determinations and draw inferences from the record of evidence. *Musto,* 135 F.Supp.2d at 225. This Court must therefore affirm the Commissioner's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir. 1987); *see Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999). "[S]tatute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." *Geoffroy v. Sec'y of Health and Human Servs.,* 663 F.2d 315, 319 (1st. Cir.1981). The Commissioner properly asserts that "[a]bsent a factual or legal error, the court cannot remand a case for further proceedings." Def.'s Mem. at 7 (citing *Manso–Pizarro,* 76 F.3d at 16).

## B. Social Security Disability Standard and the Decision of the Hearing Officer

■ The Social Security Act provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A). Standing alone, "evidence of an impairment is not enough to warrant an award of benefits; there must also be evidence in the record that the impairment prevented the claimant from engaging in any substantial activity." *Durant v. Chater,* 906 F.Supp. 706, 711 (D.Mass.1995); *Guyton v. Apfel,* 20 F.Supp.2d 156, 161 (D.Mass.1998) (citing *McDonald v. Sec'y of Health and Human Servs.,* 795 F.2d 1118, 1120 (1st Cir.1986)). The Social Security Administration has promulgated regulations that have reduced this determination of disability to a five-step analysis. The hearing officer must, and did, follow the five-step sequential evaluation process:

(1) whether the claimant is engaged in substantial gainful activity;

(2) whether the claimant has a severe impairment;

(3) whether the impairment meets or equals a listed impairment;

(4) whether the impairment prevents the claimant from performing past relevant work; and

(5) whether the impairment prevents the claimant from doing any other work.

20 C.F.R. §§ 404.1520 and 416.920(a); R. at 23–24.

■ The First Circuit has provided instruction on the application of the five-step process. *See Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).[3] At step one, the Commissioner considers whether the claimant is currently employed; if so, the claimant is automatically considered not to be disabled and the process comes to an end. *Id.* at 6.

---

3. Though this case involved SSI, the process would be the same for Social Security Disability Insurance ("SSDI") payments. *See,* *e.g., Bazile v. Apfel,* 113 F.Supp.2d 181, 185 (D.Mass.2000).

If the claimant is not currently employed, the Commissioner proceeds to step two and considers whether the claimant has a severe impairment. *Id.* A "severe impairment" is defined as an impairment "which significantly limits his or her physical or mental capacity to perform basic work-related functions." *Id.* If the Commissioner determines that the claimant does not have a severe impairment the process comes to an end; otherwise, the Commissioner proceeds to step three. *Id.* At step three, the Commissioner determines whether the claimant has an "impairment equivalent to a specific list of impairments contained in ... Appendix 1" to the Social Security Administration's regulations. *Id.* If so, the claimant is automatically found to be disabled and the process ends. *Id.* If not, the Commissioner goes on to step four and asks whether the claimant's impairment "prevent[s] him from performing work of the sort he has done in the past." *Id.* at 6–7. The burden at this stage is on the claimant. *Id.* at 7. If the answer is no, the claimant is found not to be disabled and the process ends. *Id.* If the answer is yes, the Commissioner continues to step five and considers whether the "claimant's impairment prevent[s] him from performing other work of the sort found in the economy." *Id.* The burden of proof at step five is on the Commissioner. *Id.* If yes, the claimant is found to be disabled; if not, the claimant is found not to be disabled. *Id.*

Despite Coggon's claim, the hearing officer properly applied the five step analysis in its decision, pursuant to 20 C.F.R. sections 404.1572 and 416.972. R. at 19, 23–24. The hearing officer ruled that: (1) Coggon had not engaged in substantial gainful activity, (2) her impairment or combination of impairments were "severe" in nature, (3) her medically determinable impairments did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4, (4) the

allegations made by Coggon regarding her limitations were not completely credible, (5) Coggon was able to perform a range of work at the light level of exertion, (6) Coggon was a younger individual between the ages of 45 and 49 and had more than a high school education, (7) Coggon had no transferable skills from any past relevant work and had the residual functional capacity to perform a range of light work ... identified by the vocational expert which includes work as a record clerk, cashier, assembler, and receptionist, and (8) Coggon was not under a "disability," as defined in the Social Security Act, at any time through the date of the hearing officer's decision. *Id.* at 23–24 (citations omitted). This Court rules that the hearing officer adequately considered "the medical opinions in the record regarding the severity of the claimant's impairments." *Id.* at 24. Accordingly, the hearing officer properly decided that "the claimant is not entitled to a period of disability, Disability Insurance Benefits, and not eligible for Supplemental Security Income payments." *Id.* at 25.

### C. Coggon's Challenge to the Weight Given Massarotti's Opinion by the Hearing Officer

Coggon argues that the hearing officer's decision contains errors of law and was not supported by substantial evidence. Pl.'s Mem. at 5–6. Specifically, Coggon contends that the hearing officer (1) ignored Massarotti's treating source evidence, (2) "mischaracterized [Massarotti's To Whom It May Concern letter] as an advocacy document," and (3) "substituted his own views for uncontroverted medical opinion." *Id.* (quoting *Nguyen,* 172 F.3d at 35); R. at 22. Coggon argues that the hearing officer failed to give proper weight to the opinion of Coggon's treating physician by "disregard[ing] both treating source diagnoses and treating source opinions as to functional restrictions." Pl.'s Mem. at 5.

Coggon argues that, as such, the hearing officer did not correctly apply 20 C.F.R. sections 404.1527 and 416.927 and, therefore, "committed an error of law." Pl.'s Mem. at 5–6. Coggon asserts that the Social Security Administration, *vis-à-vis* the regulations, "will give more weight, *generally*, 'to opinions from ... treating sources.'" Pl.'s Mem. at 6 (citing 20 C.F.R. § 416.927(d)(2) and *Guyton*, 20 F.Supp.2d at 167) (emphasis added). Coggon argues that the hearing officer did not "give good reasons" for the weight he gave to Massarotti's opinion. Pl.'s Mem. at 8; 20 C.F.R. § 416.927(d)(2).

█ Coggon acknowledges that opinions of treating physicians are "generally," but not always, given greater weight. *See* Pl.'s Mem. at 6. In *Rivera v. Sec'y of Health & Human Servs.*, the First Circuit stated that "[t]he [hearing officer] is not required

automatically to give controlling weight to any 'treating' doctor's report ... In some cases, 'controlling weight' may be assigned if the report meets the specified qualifications, and is not inconsistent with other substantial evidence...." 986 F.2d 1407, No. 92–1896, 1993 WL 40850 at *3 (1st Cir. Feb.19, 1993) (unpublished opinion); accord *Shaw v. Sec'y of Health and Human Servs.*, 25 F.3d 1037, No. 93–2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994) ("[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply.") (unpublished opinion);[4] *Guyton*, 20 F.Supp.2d at 167.

This court stated in *Guyton* that the hearing officer is not "obligated automatically to accept [the treating physician's] conclusions." [*Blue Mountain*,] 20 F.Supp. [165] at 167 [(D.Conn.1937)].[5]

---

4. Citation to unpublished opinions has been an issue of considerable debate, which continues until today. The Eighth and Ninth Circuits are on extreme ends of the debate. *Anastasoff v. United States*, 223 F.3d 898, 899–905 (8th Cir.2000), *vacated as moot*, 235 F.3d 1054 (8th Cir.2000) (en banc) (holding that unpublished opinions have precedential effect); *Hart v. Massanari*, 266 F.3d 1155, 1163 (9th Cir.2001) (upholding its local rule prohibiting the citation of unpublished decisions as constitutional); *see also Alshrafi v. American Airlines, Inc.*, 321 F.Supp.2d 150, 160 n. 9 (D.Mass.2004) (reviewing the holdings in *Anastasoff* and *Hart*).

For a more complete reflection of this debate, *see* Stephen R. Barnett, *In Support of Proposed Federal Rule of Appellate Procedure 32.1: A Reply to Judge Alex Kozinski*, Fed. Law., November/December 2004, at 32; Anne Coyle, Note, *A Modest Reform: The New Rule 32.1 Permitting Citation to Unpublished Opinions in the Federal Courts of Appeals*, 72 Ford. L.Rev. 2471 (2004); A Lawrence J. Fox, Note, *Those Unpublished Opinions: An Appropriate Expedience or an Abdication of Responsibility?*, 32 Hofstra L.Rev. 1215 (2004); Hon. Alex Kozinski, Letter, Fed. Law., June 2004, at 37; Gary Young, *Cite, Publish or Perish?*, Nat'l L.J., May 3, 2004, at S1.

This Court considers the reasoning of *Anastasoff* especially compelling and thus treats the holdings of unpublished opinions of the First Circuit "with great care and respect," even though the Court of Appeals itself does not accord these opinions precedential weight. *Alshrafi*, 321 F.Supp.2d at 160 n. 9; *Giese v. Pierce Chem. Co.*, 43 F.Supp.2d 98, 103 n. 1 (D.Mass.1999) (relying on unpublished opinions' persuasive authority).

5. This Court, in *Guyton*, 20 F.Supp.2d at 167 n. 14, offered an extensive review of the "treating physician rule":

The "treating physician rule" has been the subject of much debate and confusion among the circuits. *See, e.g.*, Schneider, Rachel, *A Role for the Courts: Treating Physical Evidence in Social Security Disability Determinations*, 3 U.Chi.Law Sch. Roundtable 391 (1996) (discussing different standards articulated by the circuits and the effect of the Social Security Administration's 1991 regulations). Through the creation of new regulations in 1991, the Social Security Administration attempted to create a uniform standard concerning the scope of the treating physician rule. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 Fed.Reg. 36,932, 36,-

Further, "the [hearing officer] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." *Castro v. Barnhart,* 198 F.Supp.2d 47, 54 (D.Mass.2002) (Swartwood, J.); *Rosario v. Apfel,* 85 F.Supp.2d 62, 67 (D.Mass.2000) (Ponsor, J.) (citing 20 C.F.R. § 404.1527(d)(4)). Coggon herself states that "[Massarotti's] conclusions are entitled to controlling weight *unless* [contradicted] by substantial evidence in the record, or are unsupported." Pl.'s Mem. at 6 (emphasis added); *See Arroyo v. Barnhart,* 295 F.Supp.2d 214, 220–221 (D.Mass.2003) (Neiman, M.J.). One cannot say the record supported Massarotti's opinion; rather, the record contradicts Massarotti's opinion.

Coggon argues that a hearing officer should not reject a treating source opinion "[e]ven ... if the opinion is not accorded controlling weight" because "[t]reating source medical opinions are still entitled to deference." Pl.'s Mem. at 6; 61 Fed.Reg. 34490, 34491. This deference, however, is not absolute. The language Coggon quotes reads, in full, that "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927," 61 Fed.Reg. 34490, 34491, and "[a] finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It *may* still be entitled to deference and be adopted by the adjudicator." *Id.* at 34490 (emphasis added).

The regulations list the factors a hearing officer will consider when a treating source opinion is not deemed "controlling," including (1) the examining relationship, (2) the treatment relationship, including the length, nature, and extent of treatment and the frequency of examination; (3) supportability of the opinion by evidence; (4) consistency with the record; (5) the specialization of the treating source, and (6) any other factors which support or contradict the opinion. 20 C.F.R. § 416.927(d). Controlling weight is given if the hearing officer finds that the "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Here, the hearing officer decided Massarotti's medical opinion

935–37 (1991) (discussing the treating source regulation).

The First Circuit's articulation of the standard in *Rivera* and *Shaw* appears correctly to describe the analysis for determining what weight to assign to a treating source's opinion in light of the 1991 changes. These opinions are also in accord with the treating physician standard as defined in the Second Circuit following its decade-long debate over the proper standard and the authority of the Social Security Administration. *See, e.g., Schaal v. Apfel,* 134 F.3d 496, 503–04 (2d Cir.1998); *Schisler v. Sullivan,* 3 F.3d 563, 568–69 (2d Cir. 1993).

Despite the 1991 regulations, however, district courts in the First Circuit have, on occasion, misstated the correct standard for evaluating the conclusions of a treating physician. *See, e.g., Follensbee v. Sec'y of Health and Human Servs.,* CIV. 94–177–JD, 1995 WL 136935 at *6 (D.N.H. Mar.28, 1995) (unreported decision) (reasoning that "[t]he First Circuit has made it clear that the [hearing officer] is [not] required to ... give greater weight to conclusions advanced by treating sources" based upon case law that pre-dates the 1991 regulations); *Weiler v. Shalala,* 922 F.Supp. 689, 698 (D.Mass.1996) (stating that a treating physician's opinion will always be given greater weight "even if the treating source's opinion is inconsistent with other substantial evidence of record."). While the ultimate result in both of these cases appears to be correct, the courts' analyses of the treating physician standard was not.

was "unsupported by clinical evidence" and was an "advocacy" opinion. R. at 22 (citing 20 C.F.R. § 404.1527(d)(3)).

Though the treating source, pursuant to the regulations, is "generally" given "more weight," this is not absolute. 20 C.F.R. § 416.927(d)(2), (5). It is true that Massarotti was a specialist and indeed treated Coggon on several occasions and had knowledge of her impairment and history. Coggon, however, ignores the fact that Massarotti's letter came six months after her last visit with Massarotti and that her opinion in January of 2002 came more than one year after her last visit to Massarotti. Def.'s Mem. at 9. Further, the lapse in treatment came after virtually monthly visits to Massarotti. Despite Massarotti's note that "arrangements were made for [Coggon] to see [her] in two months," there is no record of Coggon in fact visiting her. R. at 179. The decrease in frequency of visits, one of the factors above, could properly be considered by the hearing officer. See 20 C.F.R. § 416.927(d)(2).

■ It was not unreasonable for the hearing officer to find that Massarotti's opinion was one of "advocacy". See 20 C.F.R. § 416.927(d)(3); R. at 22. Coggon argues that Massarotti's opinion was not advocacy in nature. Yet, "the Questionnaire[6] [completed by Massarotti] was created for use by social security disability attorneys and the opinions stated therein would have rendered [Coggon] essentially bedridden, which is not at all consistent with any of the other evidence of record concerning the severity [of] her condition." Def.'s Mem. at 15. This, together with

Massarotti's May 2001 letter stating that Coggon was "disabled"[7] and Massarotti's notes from Coggon's November 17, 2000, visit that read, "[u]nfortunately, her disability was denied," R. at 179 (emphasis added), indicate a potential bias and predisposition on Massarotti's part to advocate on Coggon's behalf.

It was also reasonable to determine that Massarotti's opinion was void of adequate supporting explanations. See 20 C.F.R. § 416.927(d)(3). Massarotti's recommendations and opinion were generally vague and unsubstantiated by the record. For instance, Massarotti indicated that Coggon had difficulty dealing with work stress yet indicated that the degree of this limitation was "[h]ard to say," R. at 238, indicated Coggon would need unscheduled breaks in a work day though she could not posit how often, R. at 240, and surmised Coggon would "likely be absent from work as a result of the impairments or treatment ... about once a month" without any reasoning or support for such opinion. R. at 241. Further, the hearing officer based his decision, in large part, in accord with 20 C.F.R. section 416.927(d)(4), on what he determined was the marked inconsistency of Massarotti's opinion with the other reports and examinations on the record.

■ The hearing officer explained what he viewed as an inconsistency in Massarotti's opinion, namely that "[i]t is not plausible that the claimant successfully lives alone, drives frequently ... and could be considered bedridden." R. at 22. Coggon claims the hearing officer "never adequately compared the opinions of Dr. Massarotti

---

6. The Questionnaire appears in section 231.4 of *Social Security Disability Practice*, a guide for lawyers who represent social security claimants. Def.'s Mem. at 15 n. 3. It is unclear on the record, and of no real consequence to this Court's decision, whether Coggon's attorney in fact asked Massarotti to complete the questionnaire.

7. The First Circuit in *Arroyo v. Sec'y of Health and Human Servs.*, indicated that a hearing officer is "not required to accept the conclusions of claimant's treating physicians on the ultimate issue of disability." 932 F.2d 82, 89 (1st Cir.1991); *see* 20 C.F.R. § 404.1527(e)(1).

with those of the other physicians. 'As a lay person ... the [hearing officer] was simply not qualified to interpret raw medical data in functional terms'." Pl.'s Mem. at 9 (quoting *Nguyen*, 172 F.3d at 35). The hearing officer, however, did not base his determination on medical data, but on Massarotti's estimation that in an eight hour period Coggon could only stand for two hours and sit for two hours. *See* R. at 239. This was not medical data, but Massarotti's estimation of Coggon's functional capacity. The hearing officer deduced, given the limited amount of time Massarotti indicated that Coggon could sit or stand, that she would be "mostly bedridden." R. at 22. It is ironic that Coggon argues, on the one hand, that the hearing officer did not consider or give weight to Massarotti's opinion and, at the same time, argues that an inference based on Massarotti's opinion is faulty. The hearing officer, not unreasonably, found Massarotti's opinion inconsistent with the objective medical evidence. The state physician's opinion further confirms the problematic nature of Massarotti's estimation, indicating that in an eight hour period, Coggon could stand for at least two hours and sit for at least six hours. R. at 169, 198. As per federal regulations, all non-examining source opinions, such as those offered by the State physician on record, are to be "consider[ed]." 20 C.F.R. § 404.1527(f)(2)(i) [8]. The hearing officer will "consider [the] findings of a State agency medical or psychological consultant [by] evaluat[ing] the findings using relevant factors [as it would a treating source opinion.]" *Id.* at § 404.1527(f)(2)(ii). The Commissioner may also place greater weight on the report of its medical expert.

*Keating v. Sec'y of Health and Human Servs.*, 848 F.2d 271, 275 n. 1 (1st Cir.1988) ("It is within the Secretary's [, namely the Secretary of Health and Human Services in a determination of disability,] domain to give greater weight to the testimony and reports of medical experts who are commissioned by the Secretary."); *Lizotte v. Sec'y of Health and Human Servs.*, 654 F.2d 127, 130 (1st Cir.1981).

██ Coggon also argues that the hearing officer ignored 20 C.F.R section 416.927(d)(3) which provides that the "more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." Pl.'s Mem. at 8. Here, the hearing officer decided to give more weight to the opinions of the consultative examiner Stammen and the non-examining DDS physicians because their opinions were, unlike Massarotti's opinion, "consistent with and supported by the record as a whole." R. at 22. The hearing officer decided that "[t]he record as a whole indicates a higher level of functioning than that indicated by Dr. Massarotti's opinion, which is unsupported by clinical evidence." *Id.* Though a hearing officer may give little weight to a medical opinion, its decision "can still pass muster if the other reasons given to accord medical reports little weight are adequately supported." *Arroyo*, 295 F.Supp.2d at 221 (citing *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir.1998) and *Gonzalez Perez v. Sec'y of Health and Human Servs.*, 812 F.2d 747, 749 (1st Cir.1987)). Such was the case here.

---

8. 20 C.F.R. section 404.1527(f)(2)(i) states, in part, that:

State agency medical and psychological consultants are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.

Therefore, [hearing officers] must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [Coggon is] disabled.

■ Further, though Coggon argues that the hearing officer did not properly "evaluate the treatment notes nor the May 12, 2001 letter from Dr. Massarotti," Pl.'s Mem. at 9, a hearing officer need not "expressly refer to each document in the record, piece-by-piece." *Rodriguez Torres v. Sec'y of Health and Human Servs.*, 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. September 11, 1990). A hearing officer "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *NLRB v. Beverly Enterprises–Massachusetts, Inc.*, 174 F.3d 13, 26 (1st Cir.1999). Although the hearing officer cannot derive his factual conclusions by ignoring evidence, *see Nguyen*, 172 F.3d at 35, he is not required to address every piece of evidence in the record:

> Courts have held that a [hearing officer]'s failure to address a specific piece or pieces of evidence did not undermine the validity of [his] conclusion, for example, when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was either cumulative of the evidence discussed by the [hearing officer] or otherwise failed to support the claimant's position.

*Lord v. Apfel*, 114 F.Supp.2d 3, 13 (D.N.H. 2000) (citing *Rodriguez Torres*, 915 F.2d 1557, 1990 WL 152336, at *1–4; *Goodermote*, 690 F.2d at 8; *Ortiz v. Apfel*, 55 F.Supp.2d 96, 103 & n. 1 (D.P.R.1999) (concluding that therapy notes made by psychiatrist, which were not discussed by the hearing officer, did not appreciably support claimant's claim)).

Coggon argues that deeming Massarotti's May 2001 letter of opinion an "advocacy opinion" is incorrect as matter of law.

> [T]he mere fact that a medical report is provided at the request of counsel, or, more broadly, the purpose for which an opinion is provided, is not a legitimate

basis for evaluating the reliability of the report.... [I]n the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it.

*Reddick*, 157 F.3d at 726 (internal citations and quotations omitted). Coggon asserts that although it might be proper "to reject a doctor's opinion letter [that] varied from his treatment notes and 'was worded ambiguously in an apparent attempt to assist the claimant in obtaining social security benefits'" it was improper to reject Massarotti's opinion simply because Coggon's attorney had solicited it. *See* Def.'s Mem. at 15 & n. 3; *Reddick*, 157 F.3d at 726 (quoting *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996)). In *Gonzalez Perez*, the First Circuit stated that in its "review of social security disability cases, it appears to be a quite common procedure to obtain further medical reports, after a claim is filed, in support of such a claim. Something more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support a[hearing officer]'s decision to discredit them." 812 F.2d at 749; *accord Arroyo*, 295 F.Supp.2d at 220. Coggon asserts that, as in *Arroyo*, "[i]t is ... difficult ... to understand how the opinions of the treating physician, whose long history with the claimant is demonstrated by the record, is contradictory to that record." Pl.'s Mem. at 10 (quoting *Arroyo*, 295 F.Supp.2d at 222). Yet, the hearing officer did not "discredit" the opinion based on "timing and impetus." *Cf. Gonzalez Perez*, 812 F.2d at 749. Here, the hearing officer found that "[t]he record as a whole indicates a higher level of functioning than that indicated by Dr. Massarotti's opinion." R. at 22.

The determination of disability is left to the hearing officer, and the opinion of an individual physician stating that a claimant

is "disabled" is in no way binding. *See* 20 C.F.R. §§ 404.1527(e); 416.927(e); *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir.1991) (indicating that a hearing officer does not have to accept a physician's opinion of disability). Additionally, "Dr. Massarotti's opinion that Plaintiff was disabled came six months after her last physical examination of [Coggon]," despite Massarotti's indication in the treatment notes that arrangements were made for Coggon to see her in two months "and the opinions in [the] Arthritis Residual Functional Capacity Questionnaire came over a year after her last examination." Def.'s Mem. at 16; R. at 179. "Thus, she would not appear to have been actively involved in [Coggon's] treatment at the time she made these various opinions." Def.'s Mem. at 16.

Coggon also argues that the hearing officer failed to give due weight to the fact that Massarotti's opinions were within her specialty. Pl.'s Mem. at 9; 20 C.F.R. § 416.927(d)(5). Further, Coggon refers to Massarotti's May 12, 2001, "To Whom It May Concern" letter in which she wrote, "I see numerous patients with rheumatic diseases and I believe this patient's disease is not in remission despite aggressive treatment. Over the next several months, we will attempt to modify her treatment regimen further to alleviate her symptoms, but I believe she will continue to be disabled from her rheumatoid arthritis." R. at 233; Pl.'s Mem. at 9. Coggon argues that "it was her clinical knowledge that came from treating this patient, and making numerous adjustments in that treatment over the course of more than 5 years, that was the basis of the doctor's opinion." *Id.* at 10. Though specialty is to be considered, one must also consider the "examining or treating relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole" and other factors. Def.'s Mem. at 16–17; 20 C.F.R. §§ 404.1527(d), 416.927(d). The

hearing officer reasonably gave Massarotti's opinions less weight due to the lack of "supportability," 20 C.F.R. § 404.1527(d)(3), and lack of "consistency." 20 C.F.R. § 404.1527(d)(4); *see* R. at 22. Further still, the hearing officer did not reject or ignore the opinion of Massarotti; he simply found it an advocacy opinion and deserving of less weight given the weight of the record to the contrary. *See* R. at 22.

### D. Assessment of Coggon's Subjective Complaints of Hand Pain

 The First Circuit has established that "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Dupuis v. Sec'y of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir.1989)(citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 21 (1st Cir.1986)). In evaluating a claimant's subjective complaints of pain, *Avery* instructs the hearing officer to consider six factors:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) *The claimant's daily activities.*

*Avery*, 797 F.2d at 29 (emphasis added). If a hearing officer determines that the claimant is not credible, this finding "must be supported by substantial evidence and the [hearing officer] must make specific findings as to the relevant evidence he considered in determining to disbelieve the

appellant." *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986).

Coggon argues that the standard used to evaluate pain is clear in the First Circuit. *Dupuis*, 869 F.2d at 623 (asserting that "complaints of pain ... must be consistent with medical findings"); *Avery*, 797 F.2d at 21 (stating that the pain "must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged"); *see* Pl.'s Mem. at 11. Coggon also asserts that the hearing officer "mischaracteriz[ed the] pain in her hands as a 'new' impairment." Pl.'s Mem. at 11. Coggon further argues that the record repeatedly reflects her complaints of hand pain, citing complaints to Massarotti, Massarotti's May 2001 letter, Coggon's first disability application in June of 2000, and the August 2000 pain questionnaire. Coggon argues that the hearing officer mistakenly failed to note that the Residual Functional Capacity Report of January 2002 was not the first time this complaint of hand pain had been made. Pl.'s Mem. at 11.

It is true that complaints of pain "need not be precisely corroborated by objective findings." *Dupuis*, 869 F.2d at 623. Nonetheless, such complaints "need not be accepted to the extent they are inconsistent with the available evidence." *Mickles v. Shalala*, 29 F.3d 918, 927 (4th Cir.1994). All of Coggon's allegations are mere complaints and are neither supported by, nor consistent with, the medical findings or the record. Stammen and the DDS doctors found "the claimant's impairments were not severe enough to be considered in any way disabling [and t]hey did not find any credible evidence as to hand dexterity difficulties. Although they were

non-examining physicians, [their opinions] are given significant weight in determining the claimant's residual functioning capacity because their opinion is consistent with and supported by the record as a whole." R. at 22. "[T]he [hearing officer] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." *Castro*, 198 F.Supp.2d at 54; *Rosario*, 85 F.Supp.2d at 67 (citing 20 C.F.R. § 404.1527(d)(2)); Def.'s Mem. at 10.

The hearing officer based his assessment concerning Coggon's functional limitations in part on his finding that Coggon was not fully credible regarding the extent to which her impairments limited her ability to work. Coggon complained to Massarotti at times of having difficulty with daily activities, R. at 180, 182, but Masserotti's treatment notes also indicated improvement. R. at 181. Coggon was able to perform daily functions [9] such as "dressing and bathing, using the stove, putting dishes in the sink, laundry in the washer, if it is not heavy.... She is capable of interacting, going to the store to get items, and capable of cashing a check or using an ATM machine." R. at 144. It is well established that Coggon drove an automobile. R. at 32–33, 40–41. Massarotti herself indicated that if she went to work, Coggon would only miss "about on[e day] a month" as a "result of the impairments or treatment." R. at 241. These activities are well-supported by substantial evidence in the record.

Though it appears in the Arthritis Residual Functional Capacity Questionnaire, there is no record of reduced grip

---

9. "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Part 404, Subpart P.App. 1, § 12.00(C)(1).

strength, or testing, in Massarotti's treatment notes. R. at 22; Def.'s Mem. at 11 n. 1. Massarotti, however, indicated that Coggon could only use her hands and arms twenty-five percent of the time during a work day. R. at 241. The record is replete with findings that Coggon moved well, R. 147–148, including Massarotti's own treatment notes, R. 182, 184–185. Accordingly, there is no record support for the claims of hand pain. The hearing officer found that Massarotti simply "summarized" and "noted" Coggon's history of "pain in her hands." R. at 20. In support of his decision that the limited use of hands was "not clinically substantiated," R. at 22, the hearing officer sufficiently considered the following:(1) the initial report at New England Medical Center in November of 1999, R. at 20 ("[H]er ... hands moved well"); (2) Stammen's report, R. at 19, 21–22 ("There was full range of motion of the cervical spine, shoulders, and elbows as well as full range of motion of the hands and wrists. Digital dexterity was normal and the claimant could make a [full] fist without difficulty," and "Her independent physical exams by Dr. Stammen were unremarkable for limitations of motion involving her ... shoulders, elbows, hands, and wrists."); (3) the opinions of the non-examining state agency consultants, R. at 22 (noting "[t]hey did not find any credible evidence as to hand dexterity difficulties"); (4) the absence of credible support in Massarotti's opinion, R. at 21 ("Massarotti fails to explain how her patient successfully lives alone, takes care of all chores, shopping, cooking, and cleaning, and has the bimanual dexterity to drive her automobile."); and (5) the "preponderance of the evidence" on the record, R. at 21 (noting there is "no substantial clinical evidence"

of hand pain). Given the evidence before him, the hearing officer could have concluded, and did conclude, that the extent of Coggon's daily activities sufficiently undermined her claim of impaired hand use and disability.

### E. Errors allegedly made by the Hearing Officer

#### 1. Opinion of the Hearing Officer

Courts have held that a decision of a hearing officer is sufficient when the conclusion is supported by citations to substantial medical evidence in the record and the unaddressed evidence is either cumulative of the evidence discussed or otherwise fails to support the claimant's position. *Lord,* 114 F.Supp.2d at 13 (citing *Rodriguez Torres,* 915 F.2d 1557, 1990 WL 152336, at *1–4 and *Goodermote,* 690 F.2d at 8).

Coggon asserts that she was not given "good reasons" by the hearing officer for the lesser weight given Massarotti's opinion. Pl.'s Mem. at 8; 20 C.F.R. § 416.927(d)(2). In fact, the hearing officer did indicate his reasons for giving lesser weight to Massarotti's medical opinion, namely, that it was "unsupported by clinical evidence" and was an "advocacy" opinion. R. at 22 (citing 20 C.F.R. § 404.1527(d)(3)).

In *Agresti v. Sec'y of Health and Human Servs.,* this Court reversed a decision of a hearing officer on the ground he had provided insufficient support in his opinion. 631 F.Supp. 1245, 1249–51 (D.Mass. 1986). That case, however, was egregious in nature and is entirely distinguishable from this matter.[10] This Court ruled in

---

10. This Court in *Agresti* stated, "[a]lthough remand seems appropriate, the Secretary has asked the Court to choose between affirming or reversing. Accordingly, given this choice, the Court unhesitatingly reverses the decision of the Secretary. This is not to say, however, that the Court could not reverse on other grounds. In fact, the substantial weight of the evidence dictates a reversal in any case." *Agresti,* 631 F.Supp. at 1251.

*Agresti* that there was insufficient support in the record for the hearing officer to adequately rely on the opinion of a physician who was familiar to the hearing officer, and that the hearing officer had "an obligation both to claimants and to reviewing courts to make full and detailed findings and to articulate reasons in support of his ultimate conclusion." 631 F.Supp. at 1249; *see e.g., Small v. Califano,* 565 F.2d 797, 801 (1st Cir.1977). In *Agresti,* this Court held it was "an abuse of discretion [for the hearing officer] to ignore Agresti's whole record to rely instead on a familiar and proven non-examiner." *Agresti,* 631 F.Supp. at 1249. This Court held that the hearing officer in that case decided "on the basis of the hearing record as a whole" and gave "no indication that this statement is not rote at best and pure invention at worst." *Id.* at 1250. As such, this Court asserted that the hearing officer had "abdicated his responsibilities," concluding "his practices [were] arbitrary and capricious" and that "his actions constitute[d] an abuse of discretion." *Id.* at 1250–51.

 "Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand ... for further explanation." *Crosby v. Heckler,* 638 F.Supp. 383, 385–86 (D.Mass.1985) (Zobel, J.); *see Small,* 565 F.2d at 801. This Court held the hearing officer in *Agresti* committed, "clear error of law when he 'deemed it unnecessary ... to summarize in detail the remainder of the medical record'." 631 F.Supp. at 1250 (quoting *Small,* 565 F.2d at 801). Further still, the hearing officer "fail[ed] to mention a single medical report or to name a solitary treating and examining physician" in his decision. *Id.* "In the discharge of his duties, the [hearing officer] is to weigh the evidence, resolve the material conflicts in the testimony, and determine the case accordingly." *Id.* This Court ruled that the decision of the hearing officer in

*Agresti* was "wholly conclusory" and did not "cite to the record, name a treating physician, or refer to specific facts" and "fail[ed] utterly to evaluate or even to acknowledge a single one of the many medical reports from examining and treating physicians." *Id.*

None of this can be said of the decision of the hearing officer in this matter. Here, the hearing officer reviewed and weighed evidence, including the reports of the treating and examining physicians, and reviewed facts. He cites Drs. Massarotti, Stammen, Slayton, and Jonas in his decision. He found, not unreasonably, that "[t]he record as a whole indicates a higher level of functioning than that indicated by Dr. Massarotti's opinion, which is unsupported by clinical evidence" and that less weight would be given to Massarotti's opinion because it was "advocacy" in nature. R. at 22. The hearing officer sequentially applied the applicable regulations and determined that Coggon's impairments, while severe, did not rise to the level of "disability" as defined in the Social Security Act. There is no error.

### 2. Emotional Condition

Coggon argues that both Massarotti and Jonas indicated that her "emotional condition impacted her perception of pain." Pl.'s Mem. at 12. Coggon testified that her "pain primarily related to walking on her feet." R. at 22. Coggon argues that while Jonas observed that she showed no outward reaction to her stomping her feet at the hearing, he believed "this might also reference the personality issue, particularly with the dependence related features." R. at 48; Pl.'s Mem. at 12. Coggon argues that Jonas said that this "might also reference the personality issue" but ignores the intermediate sentence which reads, "I'm not sure that the complaint of pain is not *substantially amplified* in contrast with the actual objective condition." R. at 48 (emphasis added). Further, Jonas found

that she only had "moderate limitations in one category, her social functioning." R. at 22. Dr. Jonas testified that:

There did seem to be some inconsistencies here. For example, the complaint of foot pain is substantial, but the physical findings are frankly modest considering the record, and to extend then on to some experience with Ms. Coggon in the hearing today, I noted, as was noted in the record, not only that she is able to walk, is [sic] apparently relatively normal shoes and without cane or crutch or anything, but also without a limp. [S]he had ... a personal tendency to stamp her feet on the ground... I was surprised that she would do that, but she also didn't seem to react to that by feeling an increase of pain.

R. at 47–48.

Coggon argues that the hearing officer "only considered half the evidence and missed the context." Pl.'s Mem. at 12. In support of this assertion, Coggon makes reference to Jonas's testimony at the disability hearing wherein the hearing officer pointed out a "key" element of Slayton's report, R. at 50, and Jonas replied, "[y]ou actually only read the second half of the sentence. And we're missing a very important piece of context." R. at 50–51. Yet, Coggon again takes the statement out of context and ignores the hearing officer's initial acknowledgment of the potential problem of reading only a portion of the report when the hearing officer posed the question to Jonas at the hearing. The hearing officer stated "[i]n Dr. Slayton's report, *which you have to read it all, I think it's about five pages, to get the full picture,* and *I don't want to just extract things,* but to analyze it there is no other

way to do it. A key sentence is near the end." R. at 50 (emphasis added). Coggon, ignoring the hearing officer's own acknowledgment, improperly deems the analysis faulty and outcome determinative.

### 3. Factual Errors

Coggon argues that the hearing officer incorrectly indicated that she lived in a third-floor rather than a first-floor apartment, that she regularly works out in a gym, and that she attends sports events in Worcester, Pl.'s Mem. at 12; R. 22, 32, 132, or more accurately "drives frequently from Hull to Worcester." R. at 22. This Court, in *Musto,* held that "minor discrepancies between the facts as characterized by the [hearing officer] and the facts as reflected in the record [does] not justify a finding that the credibility determination of the [hearing officer] was not supported by substantial evidence." 135 F.Supp.2d at 229 (citations omitted); *see Hauk v. Chater,* 894 F.Supp. 407, 412 (D.Kan.1995) (holding that substantial evidence existed to support the decision by the hearing officer despite his potentially inaccurate credibility findings); *Gilson v. Apfel,* 66 Soc. Sec. Rep. Service 104, 2000 WL 145814 (N.D.Cal. Feb. 2, 2000) ("Plaintiff may ... be correct to assert that the [hearing officer]'s opinion included some minor misstatements. However, even considering these errors, it is clear that the [hearing officer]'s decision was supported by substantial evidence."). In this matter, akin to *Musto,* "[a]s a whole, the record in this case supports the determination of the [hearing officer] that [Coggon] leads a fairly active life, and [the hearing officer's] findings to that effect ought not be disturbed." [11] 135 F.Supp.2d at 229.

---

11. "This Court does not intend to underrate the importance of correct fact-finding by the [hearing officer] ...." *Musto,* 135 F.Supp.2d at 229 n. 5 (citations omitted). As this Court explained in *Musto:*

In *Forness,* the Second Circuit described the 'grave importance of fact-finding': The correct finding, as near as may be, of the facts of a law suit is fully as important as the application of the correct legal rules to

The Third Circuit, as a parallel, has stated:

> It is important to recognize that our requirement in this regard is not designed in any way to derogate from the [hearing officer]'s responsibility under the statute to make the relevant findings of fact and "decisions as to the rights of any individual applying for" benefits. 42 U.S.C. [§ ] 405(b) (1976). We are also cognizant that when the medical testimony or conclusions are conflicting, the [hearing officer] is not only entitled but *required to choose* between them. We cannot expect that this choice by the [hearing officer], in the exercise of his or her statutory responsibility, will be accompanied by a medical or scientific analysis which would be far beyond the capability of a non-scientist.
>
> We interpret our prior language and holding in light of our statutory function of judicial review. In this regard we need from the [hearing officer] not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

*Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981). This Court holds that here the hearing officer sufficiently reviewed the record and Massarotti's opinion. Coggon has not demonstrated the requisite substantial inconsistent evidence to reverse or remand the decision of the hearing officer. The hearing officer indicated that "[a]ll of the medical opinions in the record regarding the severity of the claimant's impair-

ments have been taken into account." R. at 24. Though his decision could benefit from a greater articulation of the specific reasons for affording Massarotti's opinion lesser weight, is nonetheless supported by the record. The Court holds that the hearing officer, in determining Coggon's residual functional capacity, properly relied on the functional assessments of the non-examining physicians and did appropriately consider Massarotti's opinion.

### 4. Hypothetical Question to the Vocational Expert

Coggon argues that the hearing officer erred in his hypothetical question to the vocational expert because he never presented the evidence of hand pain to the vocational expert.

■ In order to rely on a vocational expert's testimony, a hearing officer must base her hypothetical on a substantially supported assessment of the claimant's functional limitations. *See Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994). In *Arocho v. Sec'y of Health & Human Servs.,* the First Circuit decided that a vocational expert's responses are relevant only in response to hypotheticals that correspond to the medical record. 670 F.2d 374, 375 (1st Cir.1982). "To guarantee that correspondence, the [hearing officer] must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." *Id.; see Flagg v. Barnhart,* 2004 WL 2677208, slip op. (D.Me. Nov. 24, 2004). Simply because Coggon complains of hand pain does not mean the record adequately reflects her claims, that her claims are credible, or that there is sub-

---

the facts as found. An impeccably 'right' legal rule applied to the 'wrong' facts yields a decision which is as faulty as one which results from the application of the 'wrong' legal rule to the 'right' facts.

*Id.* at 229 n. 5 (citing *United States v. Forness,* 125 F.2d 928, 942 (2d Cir.1942)).

stantial evidence to support her claims. Here, the hearing officer could well have heard Coggon's complaints to Massarotti, together with all of the testimony of the non-examining sources who do not reflect any hand problems, weighed it, and determined there was insufficient support to present it to the vocational expert.

██ The vocational expert was, in fact, posed a hypothetical involving the effect of "limitations using both hands on a regular basis ... difficulty gripping things ... difficulty closing jars and ... limitations on picking things up using both hands" and though he stated that such a situation would "limit the number of jobs," he recommended, R. at 59, the vocational expert did not state that such an impairment would prevent the hypothetical person from engaging in substantial, gainful activity. "Evidence of an impairment is not in itself enough to warrant an award of benefits; a claimant must also demonstrate that the impairment prevents him from engaging in any substantial gainful activity." *Guyton,* 20 F.Supp.2d at 161 (citing *McDonald,* 795 F.2d at 1120). Coggon has failed to make such a demonstration. All things considered, the hearing officer's exclusion of hand pain from his hypothetical question to the vocational expert is reasonable and not in error.

**F. Attorney's Fees**

The Commissioner reserved the right to oppose any award of attorney's fees to Coggon pursuant to the Equal Access to Justice Act. *See* 28 U.S.C. § 2412(d)(1)(A) (providing that a "court shall award to a prevailing party ... fees and other expenses ... including proceedings for judicial review of agency action, brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."); *Wells v. Barnhart,* 267 F.Supp.2d

138, 149 (D.Mass.2003). As Coggon does not prevail here, this issue is moot.

**I. CONCLUSION**

This Court "must uphold the Secretary's findings in this case if a reasonable mind, reviewing the entire record as a whole, could accept it as adequate to support the Secretary's conclusions." *Agresti,* 631 F.Supp. at 1248 (citing *Rodriguez v. Sec'y of Health and Human Servs.,* 647 F.2d 218, 222 (1st Cir.1981)). This Court rules that a reasonable mind could accept the entire record as adequate to support the Secretary's conclusions. This Court also holds that the hearing officer's decision was supported by substantial evidence and free from errors of law. *Geoffroy,* 663 F.2d at 319. Accordingly, Coggon's Motion to Reverse or Remand the Decision of the Commissioner of the Social Security Administration [Doc. No. 5] is DENIED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 11] is ALLOWED.

The request for attorney's fees is DENIED.

SO ORDERED.