**Pamela M. WHITZELL Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. CIV.A.04–11532–WGY.**

United States District Court,
D. Massachusetts.

July 29, 2005.

Christopher Alberto, United States Attorney's Office, Boston, MA, for Commissioner Jo Anne B. Barnhart, Defendant.

Morris Greenberg, Green & Greenberg, Providence, RI, for Pamela M. Whitzell, Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

The plaintiff Pamela M. Whitzell ("Whitzell") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). Whitzell challenges the decision of the Administrative Law Judge ("hearing officer") denying her application for Supplemental Security Income. She argues "that the Commissioner erred as a matter of law in determining that she is not entitled to benefits and issued a decision which was not based on substantial evidence . . . ." Pl.'s Br. at 1 [Doc. No. 14]. Whitzell requests this Court remand this case with instructions to award benefits or, in the alternative, remand the case for reconsideration. *Id.* at 21. The Commissioner filed a Motion for Order Affirming the Decision of the Secretary [Doc. No. 17 ].

## II. BACKGROUND

### A. Procedural History

Whitzell filed for Supplemental Social Security Income on December 11, 2001,

alleging an onset of disability on April 1, 2001. R. at 66–68. On February 19, 2002, the Commissioner denied Whitzell's claim. *Id.* at 38–41. Upon request for consideration, *id.* at 42, Whitzell's application was reevaluated and again denied on May 20, 2002. *Id.* at 43–46. As a result, Whitzell requested and was granted an oral hearing before hearing officer Barry H. Best on May 7, 2003. *Id.* at 47, 53. After the hearing and review of the evidence, *id.* at 19–29, the hearing officer denied Whitzell's claim on November 17, 2003 because (1) the severity of symptoms and degree of incapacity alleged was not credible, (2) there are a significant number of jobs the plaintiff could perform, and (3) Whitzell had not established disability as defined in the Social Security Act. *Id.* at 28–29.

Following the unfavorable decision, Whitzell petitioned the Social Security Appeals Council for a review of the hearing officer's decision. *Id.* at 13–14. The Appeals Council denied Whitzell's request for review, making the hearing officer's decision the final decision of the Commissioner. *Id.* at 5–8. On July 8, 2004, Whitzell filed the instant action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). Pl.'s Compl. ¶¶ 1–2 [Doc. No. 2].

### B. Factual Background

Whitzell was born on November 27, 1971. R. at 66. She is an unmarried, single mother with four children who, at the time of the hearing, were ages ten through fifteen. *Id.* at 292. Whitzell resides with her children in a first floor apartment in New Bedford, Massachusetts. *Id.*

Whitzell completed her GED education and Certified Nursing Assistant training. *Id.* at 292. From October 2, 1998 through August 4, 2001, Whitzell worked as a certi-

fied nurse's assistant at a nursing home in Auburn, Maine where her duties included, among other things, lifting residents from chairs to beds. *Id.* at 83. On April 2, 2001, she accidentally twisted her back while so lifting a resident. *Id.* at 136. As a result of this injury, Whitzell underwent physical therapy treatments and received cash benefits through Workers' Compensation. *Id.* at 293–94. Whitzell also receives Aid to Families with Dependent Children, or AFDC, support. *Id.* at 294.

At the hearing, Whitzell testified that she can no longer work due to both physical and mental limitations, including depression, anxiety, lower back and wrist pain, migraine headaches, sleeping problems, and communication problems with other individuals. Pl.'s Br. at 8–9; R. 294–95, 300–07. Whitzell's daily activities include watching TV, doing some housework, resting to alleviate pain, sitting with her children while they do their homework, and driving to doctor's appointments or to go grocery shopping. *Id.*

### 1. Medical Evidence

### a. Physical Conditions

On April 3, 2001, Whitzell went to the emergency room at St. Mary's Regional Medical Center, where she was diagnosed with acute lumber strain and given prescriptions for Ibuprofen 800, Vicoden, and Flexiril as a result of twisting her back while assisting a patient at work. Pl.'s Br. at 3. Whitzell's condition was considered stable and she was discharged. R. at 137.

Whitzell returned to the Emergency Room on May 1, 2001, stating that while the Vicoden and Flexiril initially seemed to help her back pain, she felt "worsening numbness and weakening in both arms, which extend[ed] to her fingers, and at times she unintentionally dropp[ed] objects which she [was] holding." *Id.* at 143. Furthermore, Whitzell claimed "weakness

in her left leg that extend[ed] down to her knee," along with back and shoulder pain which she rated as an eight out of ten. *Id.* An examination revealed "slight tenderness to palpation on the right lower paraspinal muscle," however x-rays of the spine were negative. *Id.* at 144. Whitzell was scheduled for an MRI and referred to a neurosurgeon. *Id.* at 144–45. Dr. Douglas R. Wood ultimately diagnosed Whitzell with back pain with neuropathy and discharged her with instructions to continue light duty until her appointment with the neurosurgeon. *Id.*

During April and May of 2001, Dr. Thomas F. Mogan, D.C. treated Whitzell in a series of chiropractic appointments. *Id.* at 250–59; Pl.'s Br. at 3. Dr. Mogan subsequently referred Whitzell to Dr. Douglas M. Pavlak, a physical and rehabilitation specialist. R. at 250. In his May 15, 2001 report, Dr. Pavlak noted despite some relief from the chiropractic treatment, Whitzell claimed "significant recurrent pain." R. at 240. Whitzell had returned to light work on a progressively gradual schedule, working approximately ten hours per week. *Id.* Dr. Pavlak concluded that Whitzell had "an acute upper thoracic and cervical strain which is responding poorly to conservative measures . . . [and that] she is probably at risk for delayed recovery." *Id.* at 242. Dr. Pavlak, however, considered Whitzell's condition benign in nature. *Id.* Accordingly, he prescribed an active therapeutic exercise program, along with the prescription medications Zoloft and Ultram, to alleviate sleep disturbance and pain. *Id.* Whitzell was cleared for light duty capacity, meaning "no lifting or carrying more than ten pounds on a regular basis and 20 pounds occasionally." *Id.* She was further "restricted from repetitive bending and twisting at the waist and prolonged work above

eye or shoulder level or repetitive or forceful use of upper extremities." *Id.*

Whitzell was treated by Dr. Pavlak until the settlement of her Workers' Compensation claim. Pl.'s Br. at 4. Thereafter, she saw Scott Richards, Physician Assistant ("PA–C"), who after examination on August, 3, 2001 classified Whitzell as an individual "in no acute distress." R. at 231. He found no skeletal deformities, but observed "tenderness about the paraspinal muscles with some areas of spasm." *Id.* at 232. Richards' ultimate diagnosis was chronic neck pain, chronic mid/low back pain, and paraspinal muscle pain and spasm, along with depressive syndrome and anxiety. *Id.* Treatment included Zoloft, Trazodone, prescription ibuprofen, Flexiril, and Prevacid. *Id.*

In September 2001, Whitzell began treatment with her physician, Dr. Christos N. Kapogiannis, for what she described as chronic back pain, intermittent numbness in her legs, as well as pains in her arms. *Id.* at 202. Dr. Kapogiannis ordered an MRI, *id.* at 202, which later revealed small posterior bulges at the L4–L5 and L5–S1 intervertebral discs. *Id.* at 203. In a follow-up appointment on November 30, 2001, Kapogiannis noted that Whitzell's examination again revealed "no acute distress." *Id.* at 204. Kapogiannis did, however, increase and modify Whitzell's medication to deal with her depression and anxiety and referred her for psychiatric treatment. *Id.*

As Whitzell's treating physician, Kapogiannis completed several state agency forms in January and July of 2002. Pl.'s Br. at 5. On January 8, 2002, Kapogiannis stated Whitzell was limited to "simple[ ] duties." R. at 207. Kapogiannis later completed a Physical Capacity Evaluation in July 2002, stating that Whitzell could sit for three hours in an eight hour day, stand and walk for one hour each during an eight hour day, lift and carry up to five pounds frequently, and up to ten pounds occasionally. *Id.* at 210. Furthermore, Whitzell could not crawl, kneel, or squat, but could bend occasionally. *Id.* Kapogiannis concluded that Whitzell was experiencing moderate significant pain, which would preclude her from full time employment. Pl.'s Br. at 5; R. at 211. After the oral hearing, he completed a Supplemental Questionnaire as to Residual Functional Capacity on May 23, 2003 opining that Whitzell could not sustain full time employment as a hand packer, production inspector, or assembler. *Id.* at 272–73.

Non-examining physicians Dr. Saro Palmeri and Dr. Lipski also reviewed Whitzell's records. *Id.* at 171–78, 194–201. Both Dr. Palmeri and Dr. Lipski found that Whitzell could occasionally lift twenty pounds, frequently lift ten pounds, and that she could sit, stand, and walk for six hours in an eight hour day. *Id.* at 172, 195. Dr. Lipski determined that the only postural limitation Whitzell experienced was a restriction to occasional stooping, while Dr. Palmeri restricted Whitzell to occasional climbing, stooping, kneeling and crawling. *Id.*

**b. Depression and Anxiety**

Whitzell received psychotherapy treatment from January through October 2002. Pl.'s Br. at 6. When initially evaluated in January 2002, Whitzell was diagnosed with Mood Disorder and Attention Deficit Hyperactivity Disorder, and given a treatment plan including individual therapy, Wellbutrin and Xanax. R. at 213. In her initial treatment plan with Dr. Danuta M. Fichna, Whitzell was diagnosed with depression and assigned a Global Assessment

of Functioning ("GAF") of 50.[1] *Id.* at 179. The next month, February 2002, Dr. Fichna further diagnosed Whitzell with mood and panic disorders and noted that Whitzell was depressed and experiencing decreased sleep and concentration. *Id.* at 180. Dr. Fichna's office notes consistently demonstrate diagnoses of mood disorder, depression, attention deficit hyperactivity disorder, and panic disorder. *Id.* at 182, 225, 227, 237. Whitzell remained on the prescription medications Wellbutrin and Xanax during this time. *Id.*

Dr. Fichna completed an Emotional Impairment Questionnaire in which she classified Whitzell's symptoms as moderate and concluded Whitzell is unable to sustain full time employment. *Id.* at 154–55. In April 2002, Dr. Kapogiannis completed a Supplemental Questionnaire as to Residual Functional Capacity, indicating Whitzell's mental impairments ranged from none to moderately severe. *Id.* at 219–20. Dr. Wayne G. Tessier also completed an Emotional Impairment Questionnaire, *id.* at 221–22, rating Whitzell's symptoms as generally moderate, while severe during "stress related flare-ups." *Id.* at 221. Tessier concluded that Whitzell's impairments restricted her from engaging in sustained employment. *Id.* at 222. In addition, Dr. Tessier completed a Supplemental Questionnaire as to Residual Functional Capacity, noting Whitzell had moderate limitations in her ability to relate to others and engage in activities of daily living. *Id.* at 223–24. Whitzell also had moderately severe limitations in her ability to understand, remember, and carry out instructions, perform repetitive tasks, and respond to supervision, co-workers, and work pressure. *Id.* Dr. Tessier further concluded that Whitzell was severely limited in performing complex and varied tasks. *Id.*

In addition to her own treating sources, Whitzell underwent a consultative psychological evaluation with Eithne Keenan, Ph. D., in January 2002. *Id.* 156–59. Dr. Keenan found that Whitzell's attention and concentration were mildly impaired and ultimately diagnosed her with dysthymia, borderline personality, and a GAF 60.[2] *Id.* at 159. Dr. Edwin Davidson also completed a Psychiatric Review Technique form, indicating while Whitzell suffered dysthymia, her mental impairment was not severe. *Id.* at 161–63. Lastly, Dr. Carol McKenna stated Whitzell was either "not significantly limited" or only "moderately limited" in her capacity to sustain activities

1. The Attorneys' Textbook of Medicine provides the following explanation of GAF scoring:

> The GAF Scale indicates psychological, social, and occupational functioning on a hypothetical continuum from 90 through 81 (absent or minimal symptoms of mental illness) to transient symptoms (scores of 71 through 80) to mild (scores of 61 through 70) to moderate (scores of 51 through 60) to serious (scores of 41 through 50); scores decline with greater degrees of impaired mental health to the point that the patient shows persistent danger of severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death (scores of 10 through 1). A score of 0 is assigned if inadequate information is available.
> 9–65F at P 65F.42 (3d ed.1998). "A GAF of 41–50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning, (e.g., no friends, unable to keep a job).' " Pl.'s Br. at 6 n.3 (citing DSM–IV TR at 34).

2. "A GAF of 51–60 indicates 'Moderate symptoms' (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational or school functioning (e.g., few friends, conflicts with peers of co-workers)". Pl.'s Br. at 8 (citing *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, ·Text Revision (DSM–IV TR), 34 (4th ed.2000))

in a normal work day. *Id.* at 184–86. While Dr. McKenna found Whitzell's allegations credible, she concluded that her impairments do not preclude sustained employment. *Id.* at 186.

## III. DISCUSSION

### A. Standard of Review

 Review of the Commissioner's Social Security determination is limited by section 405(g) of the Social Security Act, which provides that "[t]he findings of the Commissioner of the Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence requires "more than a mere scintilla," it is relevant evidence that a reasonable mind would accept as adequate to support a conclusion. *Id.* Furthermore, factual inferences and factual and credibility determinations based on the evidence are reserved to the Commissioner. *Rodriguez v. Secretary of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). Therefore, this Court must affirm the decision of the Commissioner "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Secretary of Health & Human Servs.*, 819 F.2d 1,3 (1st Cir.1987).

### B. Social Security Disability Standard and the Hearing Officer's Decision

 In order to receive benefits under the Social Security Act, a claimant must show she is "disabled" as defined in the statute. *Deblois v. Secretary of Health & Human Servs.*, 686 F.2d 76, 79 (1st Cir.1982). An individual is considered disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Act further provides that:

An individual shall be determined to be under a disability only if his physical or mental ... impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A). The Social Security Administration has promulgated a five-step sequential analysis used to determine whether a claimant is disabled. The hearing officer must determine:

(1) whether the claimant is engaged in substantial gainful activity;

(2) whether the claimant has a severe impairment;

(3) whether the impairment meets or equals a listed impairment;

(4) whether the impairment prevents the claimant from performing past relevant work; and

(5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education and work experience.

20 C.F.R. §§ 404.1520 and 416.920(a). While the claimant bears the burden of production and proof with regards to the first four steps, the Commissioner bears the burden of proving the claimant can perform specific jobs in the national economy. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.2001).

The hearing officer made the following findings: (1) Whitzell had not engaged in substantial gainful activity since December 11, 2001, R. at 28; (2) Whitzell has medi-

cally identifiable impairments that limit her ability to do basic work activities, namely, severe lumber degenerative disc disease, depression, post traumatic stress disorder, and personality disorder, *id.*; (3) that these impairments are not severe enough to meet or equal the impairments in Appendix 1, *id.*; (4) that, having considered the entire record and the testimony of both Whitzell and the vocational expert, the "severity of symptoms and degree of incapacity alleged by the claimant [are] exaggerated and not credible." *Id.* The hearing officer concluded that:

> [Whitzell] has the residual functional capacity to perform the exertional and non-exertional requirements of work except for an inability to lift/carry greater than 20 pounds; a "moderate" limitation in the ability to maintain attention/concentration; a "moderate" limitation in the ability to deal appropriately with the public/coworkers/supervisors; and a "moderate" limitation in dealing with the ordinary requirements of attendance/perseverance/pace (20 CFR 416.945).

*Id.* Given Whitzell's limitations, the hearing officer recognized that she is not capable of performing her past work as a certified nurse's aid nor a full range of light work. *Id.* at 28–29. There are, however, a significant number of jobs in the national economy that Whitzell could perform. *Id.* at 29 (concluding Whitzell is not disabled "[b]ased on an exertional capacity for light work, and the claimant's age, education, and past work experience"). Consequently, the hearing officer determined that Whitzell was "not disabled" as defined by the Social Security Act. *Id.*

## C. Whitzell's Challenge that the Residual Functional Capacity Assessment is Not Based on Substantial Evidence

Whitzell raises two challenges to the hearing officer's Residual Functional Capacity Assessment: (1) there are no medical opinions supporting the hearing officer's determination, and (2) the hearing officer "rejected the opinion of every treating physician who offered an opinion regarding Ms. Whitzell's [mental and physical] functional limitations." Pl.'s Br. at 9–14.

## 1. Mental Residual Functional Capacity Assessment

■ After review of the entire record, the hearing officer concluded that the Whitzell had a residual functional capacity for light unskilled work, with moderate limitations.[3] R. at 28. Whitzell argues

---

**3.** The hearing officer provided the following definition of "moderate" to the vocational expert:

> With a "moderate" impairment in maintaining attention or concentration, the claimant is able to maintain concentration and attention sufficient to perform simple work tasks for an eight hour work day, assuming short work breaks on average every two hours. The claimant is able to maintain concentration or attention required for somewhat more complex or detailed tasks occasionally, but not for extended periods of time.
>
> With a "moderate" impairment in dealing appropriately with the public, co-workers, and supervisors, the claimant is able to

interact with the public on an occasional basis, provided interaction does not require more than exchange of non-personal work-related information or hand-off of products or materials; can work in the presence of co-workers and engage in appropriate occasional social interaction, but cannot work in the context of a work team where work-related interaction with co-workers is constant and physically close; and can deal appropriately with supervisors on an occasional basis (as where subject to normal monitoring and review of work in industrial settings), but not in circumstances which, because of product considerations or for other reasons, monitoring and intervention

that the hearing officer's mental residual functional capacity assessment conflicts with evidence from Drs. Tessier, Fichna, Kapogiannis, and Davidson. Pl.'s Br. at 10–11. This Court's examination of the hearing officer's decision reveals that he did consider the record in its entirety, including the objective findings of Whitzell's treating sources. R. at 20–28. Specifically, *id.* at 22–24, the hearing officer referenced: (1) Dr. Fichna's June 2001 Emotional Impairment Questionnaire characterizing Whitzell's symptoms as moderate, *id.* at 154;[4] (2) Dr. Tessier's April 2003 Emotional Impairment Questionnaire characterizing Whitzell's symptoms as generally moderate, but severe during "stress flare-ups," *id.* at 221; and (3) Dr. Kapogiannis' April 2003 Supplemental Questionnaire as to Residual Functional Capacity characterizing Whitzell's limitations as ranging from "none" to "moderately severe." *Id.* at 219–20.[5] Despite characterizing Whitzell's symptoms and limitations as generally moderate, each of her treating sources concluded that Whitzell was unable to perform sustained full time employment. *Id.* at 155, 212, 222.

In addition to Whitzell's treating sources, the hearing officer considered and referenced the assessment of state non-examining sources. *Id.* at 23–24. Clinical Psychologist Dr. Keenan prepared a consultative examination report in January of 2002, which diagnosed Whitzell with dysthymia, borderline personality, and a GAF of 60, indicative of moderate symptoms. *Id.* at 159. Similarly, Dr. Davidson completed a Psychiatric Review Technique form in February 2002, indicating Whitzell's impairment was not severe. *Id.* at 161. In May 2002, Dr. McKenna completed a Mental Residual Functional Capacity Assessment form, noting Whitzell was neither significantly nor moderately limited in her capacity to sustain activities in a normal work day. *Id.* at 184–86. While Dr. McKenna found Whitzell's allegations of back pain and depression credible, she ultimately concluded that Whitzell's limitations did not preclude Whitzell from engaging in full time employment. *Id.* at 186.

Whitzell maintains that the hearing officer improperly evaluated the reports of Drs. Kapogiannis and Fichna when deter-

---

by supervisors is physically close and/or frequent or continuous.

With a "moderate" impairment in dealing with expectations of attendance, perseverance, and pace, the claimant is able to attend work regularly, with an occasional (not more than once monthly) late arrival or unscheduled early departure; remain at assigned work station throughout a normal work day, assuming normal work breaks; and work at a generally consistent pace with not more than minor variations. The claimant has only limited flexibility regarding work hours, work schedule, or heightened standards of productivity.

R. at 26–27 n.13.

4. The hearing officer accorded Dr. Fichna's assessment "less probative weight" due to internal inconsistencies. R. at 24 n.9. While Dr. Fichna diagnosed Whitzell with a GAF of 50, which is indicative of serious symptoms,

he also characterized Whitzell as having improved and having moderate symptoms in the Emotional Impairment Questionnaire. *Id.* at 154. The hearing officer noted this is particularly inconsistent with Whitzell's daily activities. *Id.* at 24 n. 9.

5. The hearing officer found Dr. Kapogiannis' reports to be internally contradictory, as he indicated Whitzell had none to only mild limitations in her ability to understand, remember and carry out simple tasks, respond appropriately to supervision and co-workers, yet concluded that she experienced moderately severe limitations in responding to work pressure and relating to people. R. at 219–20. The hearing officer further stated that he afforded less weight to Dr. Kapogiannis' opinion because Dr. Kapogiannis is a medical doctor and not a specialist in mental health. *Id.* at 25.

mining her residual functional capacity. Pl.'s Br. at 12. The hearing officer stated that Dr. Kapogiannis' assessment was internally contradictory, R. at 23 n.7, while Dr. Fichna's was inconsistent with his other assessments. *Id.* at 24 n. 8.

■ This Court recently visited the issue of the treating physician rule. *Coggon v. Barnhart,* 354 F.Supp.2d 40 (D.Mass. 2005). Opinions of treating sources are "generally" given more weight or controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. 416.927(d)(2); *Coggon,* 354 F.Supp.2d at 52. The hearing officer, however, is "not obligated automatically" to accept the conclusions of treating sources. *Guyton v. Apfel,* 20 F.Supp.2d 156, 167 (D.Mass.1998). A hearing officer "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." *Castro v. Barnhart,* 198 F.Supp.2d 47, 54 (D.Mass.2002) (Ponsor, J.) (citing 20 C.F.R. § 401.1527(d)(4)). The hearing officer not only found that the assessments of Whitzell's treating physicians were internally contradictory, but also inconsistent with those of the non-examining doctors. *See* R. at 23 n.7, 24 nn.8–9.

The hearing officer properly considered the opinions and provided a rationale for adopting the finding that Whitzell is able to perform sustained employment. R. at 22–26. While he did not completely adopt the conclusions of Whitzell's treating phy-

sicians with regard to her ability to perform sustained employment, the hearing officer's assessment of Whitzell's moderate symptoms and limitations is supported by substantial evidence in the record from both her treating sources and the state non-examining sources. *Id.* at 154, 159, 161, 184–86, 224. Ultimately, his assessment not only reflected all of the limitations identified by Dr. McKenna, but the assessment also expressed additional and greater limitations based on evidence from Whitzell's treating sources.[6] Therefore, the hearing officer did not reject every opinion of the treating sources, as Whitzell claims.

Despite the fact Whitzell's treating sources opined that she is mentally unable to perform sustained full time employment, the hearing officer is the individual responsible for deciding Whitzell's residual functional capacity. 20 C.F.R. § 416.946(b). Further, the opinion of a medical doctor as to a claimant's ability to work is not binding; it is the Commissioner's responsibility to make the determination of disability and to decide the weight to be given the opinion of a treating medical source. 20 C.F.R. §§ 416.927(d), (e). Since the residual functional capacity was based on substantial evidence, the hearing officer did not err as matter of law.

### 2. Physical Residual Functional Capacity Assessment

■ While determining Whitzell's residual functional capacity assessment, the hearing officer gave little weight to Dr. Kapogiannis' opinion that she was physically incapable of work due to her back

---

6. The hearing officer also accorded Dr. Tessier's functional assessments indicating that Whitzell had severe limitations in performing complex and varied tasks less weight due to internal inconsistencies with his other reports and the rest of the record. R. at 24–25 n.10.

In determining Whitzell's residual functional capacity, however, the hearing officer included additional limitations with regards to complex and detailed tasks. *See id.* at 26–27, n. 13.

disorder. R. at 25. Whitzell argues that the hearing officer improperly rejected Dr. Kapogiannis' physical residual functional capacity assessment because there was evidence supporting his opinion in the record. Pl.'s Br. at 13. The only objective evidence on record, however, is an MRI report documenting "small posterior disc bulges of L4–L5 and L5–S1." R. at 203. While the MRI may be a laboratory diagnostic technique, it does not alone sufficiently support Dr. Kapogiannis' assertion that Whitzell is unable to perform any sustained employment.

In a report subsequent to the MRI, Dr. Kapogiannis noted that Whitzell did not have any limitation in her range of motion, although she did suffer pain. *Id.* at 209. The hearing officer also noted that both Dr. Wood and Dr. Pavlak had released Whitzell for "light work." *Id.* at 25, 145, 242. In addition, non-examining physicians Drs. Palmeri and Lipski also reviewed Whitzell's records, concluding Whitzell was able to perform light duty work, with certain restrictions. *Id.* at 172, 195. Both doctors opined that Whitzell could occasionally lift twenty pounds, frequently lift ten pounds, and could sit, stand, or walk about six hours in an eight hour work day. *Id.* Dr. Palmeri noted additional postural limitations in that Whitzell is only able to occasionally climb, crawl, kneel, and stoop, while Dr. Lipinski determined occasionally stooping was Whitzell's only postural limitation. *Id.*

Whitzell clarifies that Dr. Wood released her for light work only until the time of her appointment with a neurosurgeon. Pl.'s Reply to Comm'r Mot. for Order Affirming Decision of the Sec'y ("Pl.'s Reply") [Doc. No. 20] at 5. Similarly, she emphasizes that Dr. Pavlak had released her for light work with certain restrictions. *Id.* While this information does clarify the posture of each physician, it does not fur-ther support Dr. Kapogiannis' assessment that Whitzell is unable to perform any work due to her back injury.

The record is bereft of any objective evidence that supports the severe limitations Dr. Kapogiannis placed on Whitzell's physical residual functional capacity assessment. To the contrary, the record does contain the assessments of the non-examining physicians and the treating sources opining Whitzell was capable of performing work with certain limitations. R. at 172, 195. Since Dr. Kapogiannis' assessment is supported merely by subjective complaints from Whitzell herself, along with other contradictory medical opinions, the hearing officer's treatment of Dr. Kapogiannis' assessment was proper.

### D. Whitzell's Challenge that the Hearing Officer's Credibility Finding is Not Based on Substantial Evidence

In his decision, the hearing officer stated that "[t]he severity of symptoms and degree of incapacity alleged by the claimant [are] exaggerated and not credible." R. at 28. Whitzell argues that this determination is not based on substantial evidence. Pl.'s Br. at 14. The First Circuit has held that the credibility determination of the hearing officer is entitled to deference when supported by substantial evidence. *Frustaglia v. Secretary of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987) (Skinner, J.) (citing *DaRosa v. Secretary of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986)). When evaluating the credibility of a claimant's statements, the hearing officer should examine six factors:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3)Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

*Avery v. Secretary of Health & Human Servs.*, 797 F.2d 19, 28 (1st Cir.1986).

■■■ In this Court's view, the hearing officer sufficiently examined the *Avery* factors in deciding that Whitzell's claims were not credible. R. at 20. After considering all of Whitzell's subjective complaints at the hearing and conducting a thorough review of all the objective medical evidence, the hearing officer concluded that Whitzell's alleged symptoms and degree of incapacity were inconsistent with the reports from her treating and examining physicians. *Id.* at 21–26. The hearing officer concluded that if Whitzell were truly experiencing intense symptoms, she would not be capable of caring for her household and children. *Id.* at 25. "The fact that the claimant's treating and examining physicians have reported 'moderate' (generally not 'severe') symptoms is inconsistent with the severe symptoms and degree of incapacity that she alleged at the hearing." *Id.* at 24.

The hearing officer specifically referenced (1) Dr. Fincha's June 2002 report indicating that Whitzell's mood disorder caused only "moderate symptoms," (2) Dr. Tessier's characterization of Whitzell's symptoms as moderate, although severe during flare-ups of unspecified frequency, and (3) Dr. Keenan's diagnosis of a GAF of 60 which is consistent with moderate symptoms. *Id.* at 24–25. Since the hearing officer's credibility determination is based on substantial evidence, this Court defers to his determination.

**E. Whitzell's Challenge that the Commissioner Failed to Sustain Her Burden of Establishing That There Exists Other Work in the National Economy She Can Perform**

Whitzell presents two different theories as to why the Commissioner cannot establish that other work exists in the national economy that she is able to perform: (1) the hearing officer's hypothetical question failed to consider all of Whitzell's functional limitations, and (2) the vocational expert's testimony conflicts with the Dictionary of Occupational Titles. Pl.'s Br. at 15–21.

**1. The Hypothetical Question to Vocational Expert**

Whitzell argues that the hypothetical question presented by the hearing officer "did not comprehensively describe [all of her] limitations." *Id.* at 20. Specifically, she alleges that the hearing officer failed properly to include restrictions set forth in both the mental and physical residual functional capacity assessments from Drs. Kapogiannis, Tessier, and Fichna. *Id.*

■■■ This Court has previously stated that, "[i]n order to rely on a vocational expert's testimony, a hearing officer must base her hypothetical on a substantially supported assessment of the claimant's functional limitations." *Coggon,* 354 F.Supp.2d 40, 61 (D.Mass.2005) (citing *Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir. 1994)). Furthermore, a vocational expert's answers will only be relevant if the limitations set out in the hypothetical question are based on medical evidence from the record. *See Arocho v. Secretary of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir.1982).

■ The hearing officer found that the additional restrictions set forth by Drs. Kapogiannis, Tessier, and Fichna were either internally contradictory, inconsistent with the record, or both. R. at 23–25. As such, the hearing officer afforded those opinions less weight and concluded that Whitzell could perform a range of light, unskilled work with moderate limitations. *Id.* This finding is based on substantial evidence, as indicated above. Therefore, the hearing officer did not err by omitting the additional restrictions of Drs. Kapogiannis, Fichna, and Tessier in his hypothetical to the vocational expert.

### 2. The Vocational Expert's Testimony and The Dictionary of Occupational Titles

The hearing officer provided the following hypothetical to the vocational expert at the hearing:

I'm going to ask you to consider a hypothetical claimant of the same age, education, and work experience of this claimant with a residual functional capacity for light work. But limited by the non exertional constraints which I will describe as follows. The claimant has what I would call a moderate reduction in the ability to maintain attention and concentration but I will describe that further as an ability to maintain concentration and attention sufficient to perform simple work tasks for an eight hour workday assuming short work breaks on average every two hours. The claimant would be able to maintain attention and concentration required for more complex or detailed tasks occasionally but not for extended periods of time and not on a continuous basis. . . .

*Id.* at 309–10. In response, the vocational expert testified that while such a claimant could not perform any of Whitzell's prior jobs as a nursing assistant, a cashier, or a bartender, such an individual could perform jobs as a hand packer, production inspector, and an assembler. *Id.* at 312.

The Social Security Ruling 00–4p provides, in relevant part:

Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE and [the Vocational Specialist ("VS")] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information . . . . Reasonable explanations for such conflicts, which may provide a basis for relying on the evidence from the VE or VS, rather than DOT information, include, but are not limited to: Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term "occupation," as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about

occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling.

The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

. . . . .

When vocational evidence provided by a VE or VS is not consistent with the information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict . . . .

SSR 00–4p. Whitzell notes that the hearing officer "never asked the VE whether his testimony comported with the DOT." Pl.'s Br. at 18. In addition, she contends that the testimony of the vocational expert conflicts with the Dictionary of Occupational Titles with regards to the level of work and reasoning, and thus should be remanded. *Id.* at 16.

Specifically, Whitzell argues that the jobs of a hand packer, production inspector, and assembler require a greater physical and mental capacity than light, unskilled work.[7] *Id.* She states that work as a hand packer (DOT # 920.587–018) is medium work, not light work as the hearing officer had specified. *Id.* Furthermore, a production inspector (DOT # 806.261–042) is semi-skilled work, while the hearing officer specified unskilled work. *Id.*

■ While Whitzell correctly classifies the positions cited in her brief, the Dictionary of Occupation Titles also lists various other positions with practically identical names which comport with the hearing officer's residual functional capacity of light, unskilled work.[8] For example, an Inspector and Hand Packager (DOT # 559.687–074) is light, unskilled work. Similarly, a paint-spray inspector (DOT # 741.687–010) is also classified as light, unskilled work. Therefore, this matter need not be remanded on this basis because there is no conflict between the jobs recommended by the vocational expert and the residual functional capacity of light, unskilled work.

Whitzell next argues that the reasoning level associated with the jobs cited by the vocational expert exceeds her residual functional capacity.[9] Pl.'s Br. at 16. The Dictionary of Occupational Titles assigns a reasoning level to every position, ranging

7. "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). Furthermore, Social Security Ruling 00–4p defines unskilled work as a position with a Specific Vocational Preparation time at either a level one or two. SSR 00–4p.

8. The Dictionary of Occupation Titles does not have one specific position titled "production inspector." A search for such a position,

along with a search for "an assembler," results in various positions across numerous industries. Therefore, this Court is satisfied as long as there are hand packers, assemblers, and production inspectors that are classified as light, unskilled work.

9. Both jobs cited by this Court (Hand Packager DOT # 559.687–074 and Paint–Spray Inspector DOT # 741.687–010) have reasoning levels of 2.

from a low of "one" to a high of "six." *Id.* at 17.

> Level One: Apply commonsense understanding to carry out simple one-or two-step instructions. Deal with standardized situations and with occasional or no variables in or from these situations encountered on the job.

> Level Two: Apply commonsense understanding to carry out detailed but uninvolved written and oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

*Id.* at Ex. D. Whitzell contends that positions containing a reasoning level of two are inconsistent with the restrictions in her residual functional capacity, as they require skills necessary above and beyond those needed for completion of simple tasks. *Id.* at 16–18.

The issue of whether a level two reasoning position conflicts with a claimant's ability to perform simple tasks is an issue of first impression in the district. The Commissioner cites to an unpublished Third Circuit opinion, *Money v. Barnhart*, which concluded that a reasoning level of two was not inconsistent with the limitation of simple, routine work. 91 Fed.Appx. 210, 2004 WL 362291, at *3–4 (3d Cir. Feb. 25, 2004) (unpublished).[10] The Third Circuit provided no reasoning for this conclusion. Whitzell cites to a series of cases in other districts which were remanded because the vocational expert's testimony conflicted with the reasoning level of the jobs set forth in the Dictionary of Occupational Titles. Pl.'s Reply at 8–9 (citing *Flagg v. Barnhart,* 2004 WL 2677208 at *5 (D.Me. Nov.24, 2004) and *Hall v. Barnhart,* 2004

WL 1896969 at *2 (D.Me. Aug.25, 2004) for the proposition that "[o]ther courts in this circuit have remanded cases precisely because the VE's testimony conflicted with the reasoning level of jobs as set forth in the DOT").

This Court, however, does not find it necessary to determine whether a limitation of simple tasks conflicts with a job position which has a reasoning level of two for purposes of this matter. In describing the moderate limitations associated with Whitzell's residual functional capacity of light unskilled work, the hearing officer stated:

> [Whitzell has] an ability to maintain concentration and attention sufficient to performing simple work tasks for an eight hour workday assuming short work breaks on average every two hours. *The claimant would be able to maintain attention and concentration required for more complex or detailed tasks occasionally but not for extended periods of time and not on a continuous basis.*

R. at 310 (emphasis added). A reasoning level two position, however, requires an individual to be able to "carry out detailed but involved written or oral instructions." *Id.* at Ex. D. While the hearing officer did conclude that Whitzell was able to maintain concentration required for more complex and detailed tasks, he stated that this concentration could not be sustained for extended periods of time or on a continuous basis. R. at 310. Such a limitation is inconsistent with a reasoning level two position, which could possibly require sustained or extended periods of concentration or attention. Consequently, there is a

---

10. *See* proposed Fed. R.App. P. 32.1(a) (proscribing restrictions on the citation to unpublished opinions that are not similarly imposed on published opinions). *But see generally* Niketh Velamoor, *Proposed Federal Rule of Appellate Procedure 32.1 to Require that Circuits Allow Citation to Unpublished Opinions,* 42 Harv. J. on Legis. 561 (2004) (identifying potential shortcomings of the proposed rule).

conflict between the vocational expert's testimony and the Dictionary of Occupational Titles that the hearing officer did not address in his decision. As such, this case is remanded to the hearing officer in accordance with Social Security Ruling 00–4p, so that he may provide a reasonable explanation for this apparent conflict.

## IV. CONCLUSION

Accordingly, the Commissioner's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 17] is ALLOWED IN PART AND DENIED IN PART. The Motion is ALLOWED as to the residual functional capacity assessment and the credibility finding, as this Court holds both are based on substantial evidence. The matter is REMANDED so that the hearing officer may provide a reasonable explanation for the apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.

The request for attorney's fees is DENIED.

SO ORDERED.